UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ZEVEZ MURRELL,
        Plaintiff,

vs.                                                                      No. 08-2044
TIMOTHY F. BUKOWSKI, et al.,

MEMORANDUM OPINION AND ORDER

      Before the court are the Defendants, Timothy Bukowski, Michael D. Downey, Todd Schloendorf, Zachery Richmond, Shanika Stevenson and Angela Ahrens' summary judgment motion [54], the Plaintiff, Zevez Murrell's response [64] and the Defendants' reply [67]. Defendants move for summary judgment pursuant to Fed. R. Civ. Pro. Rule 56.

Standard

      Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

      "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56©, the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56©. In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient

1

evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc*., 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659. It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997).

## Background

After screening the plaintiff's complaint and holding a merit review conference with the plaintiff, the court allowed the plaintiff to proceed on the following First Amendment claims: (1) that he was denied a vegetarian/Halal meal by Downey and Bukowski on various dates in 2007, 2008, and 2009, while Kosher and vegetarian diets were provided to three Jewish inmates; (2) that he was denied religious services and counseling on December 14, 2006, and November 22, 2006; (3) that his Ramadan rights were continuously violated in 2007 and 2008 because breakfast was not served before sunrise and dinner was served before sunset; (4) that he was denied a celebratory feast with other Muslims at the end of Ramadan in 2008; and, (5) that Richmond took his prayer rug with the approval of Schloendorf. As discussed below, Defendants are entitled to summary judgment as to each of these claims.

## Undisputed Statement of Facts

1. At all times relevant to the Amended Complaint, Plaintiff Zevez Murrell was a pre-trial detainee at the Jerome Combs Detention Center ("JCDC") in Kankakee, Illinois (Michael Downey's Aff., ¶ 4, Exhibit A [doc. 55]).
2. On April 27, 2010, Plaintiff transferred to the custody of the Illinois Department of Corrections (Ex. A, Downey's Aff., ¶ 5).
3. At all times relevant to the Amended Complaint, Defendant Timothy F. Bukowski was the Kankakee County Sheriff (Timothy Bukowski's Aff., ¶ 1, Exhibit B [doc. 55[).
4. At all times relevant to the Amended Complaint, Defendant Michael D. Downey was the Chief of Corrections for the Kankakee County Sheriff's Department (Ex. A, Downey's Aff., ¶ 1).
5. At all times relevant to the Amended Complaint, Defendants Jeffery Bright, Joe English, Todd Scholendorf, Zachery Richmond, Kent Smith, Chris Young, Shanika Stevenson, and Thomas Dorries were correctional officers at JDCD in Kankakee, Illinois (Ex. A,

2

Downey's Aff., ¶ 3).
6. Bukowski is and was not involved in the day-to-day operations of the JCDC, including the handling of grievances or requests from inmates regardless to whom they are addressed (Ex. B, Bukowski's Aff., ¶¶ 2, 5-8).

**Religious Diet Claim.**
7. Plaintiff is a practicing Muslim and has been for the past ten years (Plaintiff's Oct. 16, 2009, Dep., p. 70, Exhibit C [doc. 55]).
8. As a Muslim, Plaintiff is prohibited from eating any food containing pork or pork by-products (Plaintiff's Feb. 25, 2005, Dep., pp. 27, 29 and 35, Exhibit D [doc. 55]).
9. Halal meat is meat which has been slaughtered in a particular prescribed fashion from certain animals as dictated in the Qu'ran (Ex. D, Plaintiff's 2005 Dep., pp. 25, 28, 29, and 35-38).
10. The Muslim faith requires Plaintiff to eat a Halal meal, and allows, but does not require, a vegetarian or fish meal (Ex. D, Plaintiff's 2005 Dep., pp. 34, 43-44; Ex. C, Plaintiff's Oct. 16, 2009, Dep., p. 70).
11. The JCDC, through its third party food service provider, provides inmates with three nutritionally adequate, non-pork meals consisting of at least 2400 calories per day (Ex. A, Downey's Aff., ¶¶ 8, 12, 14, 16; Aleta Lowe's Aff., ¶¶ 1, 6, 8, Exhibit E [doc. 55]).
12. Per its contract with the JCDC, the food service provider is budgeted $3.05 per meal per inmate (Ex. A, Downey's Aff., ¶ 10; Ex. E, Lowe's Aff., ¶ 6).
13. The JCDC's regular menu complies with the allotted budget and nutritional and caloric requirements of the County Jail Standards (Ex. E, Lowe's Aff., ¶¶ 2, 6).
14. The JCDC's menu includes fruits, vegetables, grains, pasta, fish, and other nonmeat items (Ex. E, Lowe's Aff., ¶ 7).
15. Individualized meals are not provided to inmates, unless ordered by a physician for medical reasons (Ex. A, Downey's Aff., ¶ 15).
16. Providing a standardized dietary plan promotes administrative and staff efficiencies in that the same meal is purchased and served to all inmates at the same time (Ex. A, Downey's Aff., ¶ 18).
17. Offering a standard meal plan also avoids jealousy among inmates and therefore promotes jail order and security (Ex. A, Downey's Aff., ¶ 19).
18. The cost of providing a nutritionally adequate vegetarian meal is $5 per meal and therefore exceeds the allotted per meal budget by 64 % (Ex. E, Lowe's Aff., ¶ 13).
19. The additional cost of a vegetarian meal stems from the low-caloric nature of such foods which requires the purchase of more food to comply with the prison's 2400 caloric requirement (Ex. E, Lowe's Aff., ¶ 13).
20. The cost of providing certified Halal meals that meet or exceed the required calorie content would be $15 per meal, based upon the quantity of meals purchased and the type of meat contained therein. This is 391% higher than allotted under the contract with Kankakee County (Ex. E, Lowe's Aff., ¶ 11, 14).
21. In order to accommodate the religious dietary requirements of Muslim inmates, all meals served at the JCDC are completely free of pork and pork by-products (Ex. A, Downey's Aff., ¶ 16; Ex. E, Lowe's Aff., ¶ 6).

22. Chief Downey implemented the pork-free policy over 14 years ago in response to requests from Muslim inmates (Ex. A, Downey's Aff., ¶ 17).
23. In March of 2006, U.S. District Court Judge Harold Baker granted summary judgment to in favor of Defendants Downey and Bukowski in *Murrell v. Downey*, 04 cv 2277, finding that Plaintiff is not entitled to a vegetarian diet or specially prepared Halal meal, and that Defendants had complied with their constitutional duties to Muslim inmates, including Plaintiff, by providing a pork-free meal system (Case No. 04 cv 2277, Order granting Sum. Judg., d/e 32, p. 5, March 29, 2006, Exhibit F [doc. 55]).
24. Since obtaining summary judgment in the prior litigation, Defendant Downey has relied upon Judge Baker's decision in continuing the policy and practice of the JCDC to provide all inmates with pork-free meals and to deny a vegetarian diet to Plaintiff (Ex. A, Downey's Aff., ¶ 21).
25. The JCDC has housed other Muslim inmates besides Plaintiff, and no other Muslim inmate has ever requested a vegetarian diet in accordance with their religious practices or submitted a grievance stating that the provision of a pork-free diet did not comport with their religious practices (Ex. A, Downey's Aff., ¶ 22).
26. The JCDC has never provided certified Kosher meals to inmates (Ex. A, Downey's Aff., ¶ 25).
27. There was an federal inmate by the name of Robert Katzman who was detained at the JCDC from May 17, 2007, to May 24, 2007 (Ex. A, Downey's Aff., ¶ 26).
28. Katzman requested a Kosher diet in accordance with his Jewish religious practices (Ex. A, Downey's Aff., ¶ 26).
29. Chief Downey responded to Katzman that the JCDC does not provide Kosher meals (Ex. A, Downey's Aff., ¶ 26).
30. Katzman was never provided a Kosher or vegetarian meal, although he may have been provided certain types of food items, at his request, that the Country Table was able to accommodate based on the existing menu and within the contractual per meal budget (Ex. A, Downey's Aff., ¶ 27).
31. Katzman was returned to the MCC in Chicago, in part, because the JCDC could not accommodate his request for Kosher meals (Ex. A, Downey's Aff., ¶ 28).
32. Michael Nelson was a Jewish inmate detained at the JCDC from October 18, 2007, to September 21, 2009 (Ex. A, Downey's Aff., ¶ 29; Ex. E, Lowe's Aff., ¶ 15).
33. Nelson requested a special religious diet (Ex. A, Downey's Aff., ¶ 29; Ex. E, Lowe's Aff., ¶ 15).
34. Although Nelson was not provided a Kosher diet, he did submit a list of foods, including meat items, that he could eat which the Country Table was able to provide within the existing menu and contractual per meal budget (Ex. A, Downey's Aff., ¶ 29; Ex. E, Lowe's Aff., ¶¶ 16-18).
35. Inmates may supplement their diet through the JCDC's commissary menu, which offers several vegetarian and non-vegetarian food items (Ex. A, Downey's Aff., ¶¶ 30-31).
36. Plaintiff is permitted to read his Qu'ran, pray in his cell throughout the day, pray over meals, use a "prayer towel" provided by the JCDC, shower regularly (to stay clean so as not to pray with any impurities), and fast during the holy month of Ramadan (Ex. A, Downey's Aff., ¶ 7; Ex. C, Plaintiff's Oct. 16, 2009, Dep., p. 140).

**Ramadan and EID-UL FITR Feast Claims**
37. The JCDC Inmate Handbook provides for a grievance procedure wherein an inmate is to submit to a member of the corrections staff specific information regarding an alleged condition or problem on a pre-printed grievance form (Ex. A, Downey's Aff., ¶¶ 38-39).
38. All inmates are provided with a copy of the Inmate Handbook when they arrive at the JCDC (Ex. A, Downey's Aff., ¶ 38).
39. Inmate grievance forms are created in carbon-copy duplicates so that the inmate may retain a copy for his or her records (Ex. A, Downey's Aff., ¶ 40).
40. On September 20, 2007, Plaintiff submitted a grievance, complaining that: he was fasting for the month of Ramadan and that he was not receiving the proper amount of calories or regular dinners (Ex. A, Downey's Aff., ¶ 32).
41. In his September 20, 2007, grievance, Plaintiff also complained that he was not able to eat breakfast a lot of times because it was served after sunrise (Ex. A, Downey's Aff., ¶ 32).
42. In response to Plaintiff's grievance, Chief Downey asked his staff to identify all Muslim inmates participating in Ramadan (Ex. A, Downey's Aff., ¶ 33).
43. Downey then adjusted the meal delivery schedule as follows: breakfast will be served before sunrise; the lunch meals for the identified Muslim inmates will be stored in the kitchen and served to the inmates at dinner time along with their dinner tray (re- heated if necessary); and dinner will be served after sunset (Ex. A, Downey's Aff., ¶ 33).
44. On September 27, 2007, Chief Downey directed his supervisors, in writing to serve meals during Ramadan per the above schedule (Ex. A, Downey's Aff., ¶ 34).
45. The above directive was also in effect and followed during Ramadan in 2008 (Ex. A, Downey's Aff., ¶ 35).
46. Plaintiff did not submit a grievance after September 27, 2007, complaining about not receiving adequate or timely meals during the balance of Ramadan in 2007 (Ex. A, Downey's Aff., ¶ 41).
47. Plaintiff did not submit a grievance in 2008 or 2009 complaining about not receiving adequate or timely meals during Ramadan (Ex. A, Downey's Aff., ¶ 42).
48. Plaintiff has never filed a grievance relating to the alleged refusal to provide him and other inmates with a celebratory feast called the "Eid Feast" at the end of a Ramadan (Ex. A, Downey's Aff., ¶ 43).

**Religious Services/Counseling Claim**
49. On May 11, 2003, Plaintiff submitted a request for group worship with all the Muslims detained at JCDC (Ex. A, Downey's Aff., ¶ 44).
50. Downey responded to Plaintiff's May 11, 2003, request, explaining that, if Plaintiff wanted a Muslim clergy member to provide services, that clergy member should contact jail administration to make appropriate arrangements (Ex. A, Downey's Aff., ¶ 44).
51. No Muslim clergy members ever contacted the JCDC to arrange for services (Ex. A, Downey's Aff., ¶ 45).
52. Plaintiff did not provide the jail with the names of any clergy members or religious organizations that could be contacted to arrange services or individual counseling (Ex. A, Downey's Aff., ¶¶ 45, 49).

53. On October 9, 2005, Plaintiff submitted a request stating that he wished to congregate for services every Friday and Tuesday with a Muslim inmate from a different housing unit (Ex. A, Downey's Aff., ¶ 46).
54. Downey responded to Plaintiff's October 9, 2005, request by informing him that non-denominational religious services are held upon request, but inmates from different housing units are not allowed to congregate together (Ex. A, Downey's Aff., ¶ 46).
55. Plaintiff never requested to attend the non-denominational religious services available at the JCDC (Ex. A, Downey's Aff., ¶ 47).
56. On November 22, 2006, Plaintiff submitted a grievance stating that Muslims were not provided religious services or social counseling (Ex. A, Downey's's Aff., ¶ 48).
57. On November 28, 2006, Plaintiff submitted a request for prayer beads, a head covering, extra showers, and Halal soap (Ex. A, Downey's Aff., ¶ 50).
58. Downey responded to Plaintiff's November 28, 2006, request, stating that showers will be taken as scheduled, that any religious items must be submitted to jail administration for approval and that Halal soap can be purchased from the outside subject to inspection by jail administration (Ex. A, Downey's Aff., ¶ 50).
59. On November 28, 2006, Plaintiff submitted a request to see a social counselor "of some sort" (Ex. A, Downey's's Aff., ¶ 51).
60. Downey responded to Plaintiff's November 28, 2006, request by asking Plaintiff to define "some sort" (Ex. A, Downey's's Aff., ¶ 51).
61. On December 1, 2006, Plaintiff submitted a "request to see a social counselor, such as a social worker or any person who is qualified to counsel to detainees like an adult counselor from Aunt Martha's or such an organization" (Ex. A, Downey's's Aff., ¶ 52; Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 50-51; Plaintiff's Oct. 19, 2009, Dep., pp. 55-56, Exhibit G [doc. 55]).
62. Aunt Martha's is a local social service organization that provides crisis intervention for juveniles and mental health and substance abuse counseling for adults (Ex. A, Downey's's Aff., ¶ 53; Ex. G, Plaintiff's Oct. 19, 2009, Dep., pp. 55-56).
63. On December 14, 2006, Plaintiff submitted a grievance stating that he was "denied the right to see a social counselor or someone qualified to counsel to detainees" (Ex. A, Downey's's Aff., ¶ 54).
64. A physician's prescription is needed for an detainee to receive mental health or substance abuse counseling or treatment (Ex. A, Downey's's Aff., ¶ 55).
65. No physician has ever prescribed mental health or substance abuse counseling for Plaintiff (Ex. A, Downey's's Aff., ¶ 56).
66. Plaintiff never specified what he meant by "religious services" in his grievances; nor did he identify a specific religious clergyman who he wanted brought in (Ex. A, Downey's Aff., ¶ 49).
67. The jail sets aside time in its activity/program schedule for religious services and meetings with religious clergy (Ex. A, Downey's Aff., ¶ 58).
68. The JCDC Inmate Handbook describes visitation policies and procedures, which apply to both clergy and non-clergy visits (Ex. A, Downey's Aff., ¶ 59).
69. In order to arrange a religious service or a visit by a clergy member, the JCDC requires inmates to provide the name of an individual or organization that can be contacted to

arrange for a clergy member to visit the facility (Ex. A, Downey's Aff., ¶ 60).
70. As the Inmate Handbook explains, non-denominational services are offered at the JCDC and are open to any inmate who requests them (Ex. A, Downey's Aff., ¶ 61).

**Prayer Towel Claim**
71. Each inmate at JCDC is generally only allowed one towel in his or her cell. (Zachery Richmond's Aff., ¶ 5, Exhibit H [doc. 55]).
72. As a Muslim, Plaintiff was allowed to keep an additional towel in his cell to use as a prayer rug (Ex. A, Downey's Aff., ¶ 62).
73. On November 16, 2006, when collecting Plaintiff's "whites" (laundry) at 3:35 p.m., Officer Richmond took Plaintiff's extra towel (Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 140-142; Ex. H, Richmond's Aff., ¶ 7; Plaintiff's Grievance dated Nov. 16, 2006, Exhibit I [doc. 55]).
74. Officer Richmond was not aware that Plaintiff was allowed to keep an extra towel in his cell on which to pray. (Ex. H, Richmond Aff., ¶ 6).
75. Around 7:00 p.m., after Officer Richmond learned that Plaintiff was allowed to keep two towels in his cell, the towel was returned to Plaintiff (Ex. H, Richmond Aff., ¶¶ 8-9; Ex. I, Grievance dated Nov. 16, 2006).

**Failure to Protect Claim**
76. On January 25, 2009, Plaintiff was in the hallway outside a classroom after a GED class when other inmates, including Donald Eggleston, were walking towards the classroom (Angela Ahren's Affidavit, ¶¶ 2-5, Exhibit J [doc. 55]).
77. Plaintiff testified that Eggleston dropped his papers and threw up his hands like he was going to fight (Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 85-86, 90).
78. Plaintiff testified that he squared off in a boxing stance against Eggleston and prepared to fight (Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 86, 90-91).
79. Plaintiff testified that Corporal Ahrens told the inmates to stop, and stopped them from fighting (Ex. C, Plaintiff's Oct. 16, 2009, Dep. pp. 86-89).
80. Corporal Ahrens was not aware of an "no contact" order or notation concerning Plaintiff and Eggleston (Ex. J, Ahren's Aff., ¶ 10).
81. After returning Plaintiff to his cell block, Ahrens spoke with the GED teacher and asked that Plaintiff be removed from the roster as a classroom tutor because of the incident (Ex. J, Ahren's Aff., ¶ 11).
82. On January 27, 2009, Plaintiff engaged in "mutual combat" with Eggleston (Ex. C, Plaintiff's Oct. 16, 2009, Dep., p. 92; Ex. G, Plaintiff's Oct. 19, 2009, Dep., pp. 58, 92-93).
83. Plaintiff admitted that he ran into Eggleston, and they "simultaneously" began fighting (Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 92-93).
84. Plaintiff further testified that "he swung at me. I swung at him ... it was more almost simultaneously than as far as anybody doing it first" (Ex. C, Plaintiff's Oct. 16, 2009, Dep., p. 92).
85. Plaintiff testified that he sustained only a "busted lip" and emotional mistrust of the officers (Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 94-96).

86. Plaintiff further testified that he did not request medical attention (Ex. C, Plaintiff's Oct. 16, 2009, Dep., p. 95).
87. Ahrens did not escort Plaintiff to and from his GED class on January 27, 2009, and was not present for the incident on January 27, 2009, with Plaintiff and Eggleston (Ex. J, Ahren's Aff., ¶ 12).
88. On January 27, 2009, the GED teacher who was present for the fight, Wallace McNeil, notified James Stevenson, the JCDC Program Director, about the altercation (James Stevenson's Aff., ¶ 2, Exhibit K [doc. 55]).
89. James Stevenson placed a note at the bottom of the GED roster that Plaintiff should be secured first before Eggleston is picked up for class (Ex. K, J. Stevenson's Aff., ¶ 4).

**Equal Protection Claim**
90. On December 3, 2006, Plaintiff submitted a grievance, stating that female inmates assigned to segregation are not placed in isolated wards and have access to television, commissary, and microwave while male inmates in segregation do not (Plaintiff's December 3, 2006, Grievance, Exhibit L [doc. 55]).
91. Downey denied Plaintiff's December 3, 2006, grievance (Ex. L, Plaintiff's December 3, 2006, grievance).
92. During his deposition, Plaintiff testified that male inmates in segregation only have one television station to view, are not allowed commissary, and are confined to their cells 23 hours a day (Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 46-47).
93. In 2007, on average, there were approximately 536 inmates housed daily in both JCDC and the Kankakee County Detention Center (Ex. A, DowneyAff., ¶ 65).
94. Of those 536 inmates in 2007, on average, only 41 were female (Ex. A, Downey Aff., ¶ 65).
95. In 2008, on average, there were approximately 651 inmates housed daily in both JCDC and the Kankakee County Detention Center (Ex. A, Downey Aff., ¶ 66).
96. Of those 651 inmates in 2008, on average, only 48 were female (Ex. A, Downey Aff., ¶ 66).
97. In 2009, on average, there were approximately 609 inmates housed daily in both JCDC and the Kankakee County Detention Center (Ex. A, Downey Aff., ¶ 67).
98. Of those 609 inmates in 2009, on average, only 45 were female (Ex. A, Downey Aff., ¶ 67).
99. JCDC has eight housing units which can house a maximum of 454 inmates in general population and segregation (Ex. A, Downey Aff., ¶ 68).

100. On rare occasions, inmates can also be temporarily housed in booking (Ex. A, Downey Aff., ¶ 68).
101. JCDC can house a maximum of 16 inmates in the segregation units, Max B and Max C (Ex. A, Downey Aff., ¶ 69).
102. Flex Housing can house 65 inmates in four subunits – A, B, C, and D (Ex. A, Downey Aff., ¶ 70).
103. Generally, Flex A and B, which can house a total of 48 inmates, are used for female inmates (Ex. A, Downey Aff., ¶ 71).

104. Flex C and D, which contain a total of 16 single-person cells, can be used for either segregation housing or general population, depending on the jail's needs (Ex. A, Downey Aff., ¶ 72).
105. To protect the safety of the detainees, female and male inmates are separated at all times (Ex. A, Downey Aff., ¶ 73).
106. Females and males have separate housing, separate recreation areas, and separate visitation times (Ex. A, Downey Aff., ¶ 73).
107. All housing units within JCDC are currently occupied (Ex. A, Downey Aff., ¶ 74).
108. Within the JCDC, the male inmates assigned to administrative segregation, disciplinary segregation, and protective custody are housed in segregation units, either Max B and C or, if necessary, Flex C and D (Ex. A, Downey Aff., ¶ 75).
109. Generally, JCDC has 16 to 32 male inmates on segregation status (Ex. A, Downey Aff., ¶ 75).
110. Female inmates assigned to administrative segregation, disciplinary segregation, and protective custody are housed within the female units, Flex A and B (Ex. A, Downey Aff., ¶ 76).
111. Generally, JCDC has only 4 to 5 female inmates on segregation status (Ex. A, Downey Aff., ¶ 76).
112. All inmates assigned to administrative segregation, disciplinary segregation, and protective custody are kept on lockdown (detained individually in their cells) 23 hours a day (Ex. A, Downey Aff., ¶ 77).

**Due Process Claim**
113. At JCDC, the Disciplinary Board oversees all placements in disciplinary and administrative segregation (Shanika Stevenson's Aff., ¶¶ 4-5, attached hereto as Exhibit M).
114. Segregation units are used interchangeably for both disciplinary and administrative segregation (Ex. M, S. Stevenson Aff., ¶ 7; Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 146-148; Ex. G, Plaintiff's Oct. 19, 2009, Dep., pp. 94-95).
115. Segregation cells are equipped with one bed, a toilet, and a sink (Ex. M, S. Stevenson Aff., ¶ 7; Ex. C, Plaintiff's Oct. 16, 2009, Dep., pp. 146-148; Ex. G, Plaintiff's Oct. 19, 2009, Dep., pp. 94-95).
116. Inmates in segregation are allowed out of their cells for one hour each day to watch television, use a telephone, or exercise (Ex. M, S. Stevenson Aff., ¶ 7 [doc. 55]).
117. Inmates in segregation are provided with all their basic necessities, including three meals a day and a daily shower (Ex. M, S. Stevenson Aff., ¶ 8).
118. During his time at the JCDC, Plaintiff was housed in a number of different units and beds throughout the JCDC (Ex. M, S. Stevenson Aff., ¶ 9).
119. On October 10, 2006, the Disciplinary Board found Plaintiff to be a danger to fellow inmates and correctional staff and placed him on administrative segregation indefinitely after he wrote a letter threatening correctional staff (Ex. M, S. Stevenson Aff., ¶ 10).
120. On November 2, 2006, Plaintiff appealed the Disciplinary Board's decision to place him on administrative segregation (Ex. M, S. Stevenson Aff., ¶ 11).
121. Chief Downey denied Plaintiff's November 2, 2006, appeal (Ex. M, S. Stevenson Aff., ¶

11).
122. On November 14, 2006, Murrell was involved in an incident with several correctional officers resulting in Murrell being forcefully extracted from his cell (Ex. M, S. Stevenson's Aff., ¶ 12).
123. On November 24, 2006, the Disciplinary Board reviewed Murrell's administrative segregation status and determined that he still was a danger to fellow inmates and correctional staff (Ex. M, S. Stevenson's Aff., ¶ 13).
124. The Board decided to maintain Murrell on administrative segregation indefinitely on November 24, 2006 (Ex. M, S. Stevenson's Aff., ¶ 13).
125. On December 1, 2006, the Disciplinary Board reviewed Murrell's status and again decided to maintain Murrell on administrative segregation indefinitely (Ex. M, S. Stevenson's Aff., ¶ 14).
126. On December 2, 2006, the Disciplinary Board conducted a hearing regarding the November 14, 2006, incident (Ex. M, S. Stevenson's Aff., ¶ 15).
127. Murrell was present for the December 2, 2006, hearing (Ex. M, S. Stevenson's Aff., ¶ 15).
128. The Board found Murrell guilty on December 2, 2006, of violating the following rules and regulations: placing items on or covering the window or vent, breach of peace, refusing to leave or barricading himself in his cell and disobedience (Ex. M, S. Stevenson's Aff., ¶ 15).
129. The Disciplinary Board placed Murrell on disciplinary segregation for 45 days with 19 days credit for time served (Ex. M, S. Stevenson's Aff., ¶ 16).
130. Murrell was returned to general population on January 9, 2007 (Ex. M, S. Stevenson's Aff., ¶ 17).
131. Plaintiff was involved in a fight with inmate Anthony Richards on November 4, 2007 (Ex. M, S. Stevenson's Aff., ¶ 18).
132. Plaintiff received 30 days in disciplinary segregation as a result (Ex. M, S. Stevenson's Aff., ¶ 18).
133. On January 13, 2008, Plaintiff hit inmate Jorge Monino several times in the head and face (Ex. M, S. Stevenson's Aff., ¶ 19).
134. After the January 13, 2008, incident, Plaintiff was placed in administrative segregation (Ex. M, S. Stevenson's Aff., ¶ 19).
135. Plaintiff was released from administrative segregation on March 19, 2008 (Ex. M, S. Stevenson's Aff., ¶ 20).
136. Plaintiff did not submit any grievances regarding his status on administrative segregation or the lack of a hearing regarding the January 13, 2008, to March 19, 2008, segregation placement (Ex. A, Downey Aff., ¶ 63; Ex. M, S. Stevenson's Aff., ¶ 23).
137. On January 27, 2009, Plaintiff was placed on administrative segregation, pending the investigation of the physical altercation between Plaintiff and inmate Donnell Eggleston on January 27, 2009 (Ex. M, S. Stevenson's Aff., ¶ 21).
138. On February 4, 2009, the Disciplinary Board placed Plaintiff on administrative segregation status at the request of corrections staff because Plaintiff's combative nature and history of rule violations (Ex. M, S. Stevenson's Aff., ¶ 22).
139. Plaintiff was removed from segregation on March 5, 2009 (Ex. M, S. Stevenson's Aff., ¶

23).
140. Plaintiff did not submit any grievances regarding his placement on administrative segregation from January 26, 2009, to March 5, 2009 (Ex. A, Downey's Aff., ¶ 63; Ex. M, S. Stevenson's Aff., ¶ 24).

Discussion and Conclusion

First, the court notes that the Plaintiff did not respond particularly to each numbered paragraph of the Defendants' Statement of Facts Claimed to be Undisputed. Nor did he identify each fact from Defendants' statement of facts and clarify whether it is conceded to be undisputed and material, disputed and material, or immaterial. As for his statement of facts, the Plaintiff filed a document titled "Statement of Facts In Support of Plaintiff's Response to Motion for Summary Judgment" but provides no facts. Instead, he presents this court with a copy of selected exhibits previously filed by Defendants and asserts several additional facts while denying others throughout his response [64]. Although Plaintiff supports some of these additional facts with various exhibits (Pl.'s Exhibits 1-11), including his affidavit, Plaintiff never responds to Defendants' uncontested statement of facts in the manner mandated by Rule 7.1(D)(2). Neither Defendants nor this court is required to make up for Plaintiff's failure to respond to Defendant's statement of facts and "wade through improper denials and legal argument in search of a genuinely disputed fact." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (*citing Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir.2000)). Accordingly, this court accepts Defendants' statement of uncontested facts as true and undisputed.

Defendants argue that the doctrine of res judicata, or claim preclusion, bars Plaintiff's claim that the denial of a vegetarian/Halal diet violated his First Amendment rights. In 2004, Plaintiff filed a suit for money damages pursuant to 42 U.S.C. § 1983, claiming that Defendants Bukowski and Downey had denied him a vegetarian or Halal diet in violation of his freedom of religion rights under the First Amendment (*Murrell v. Downey*, Case No. 04 cv 2277). Defendants moved for summary judgment, arguing that the jail provided a non-pork diet to all inmates in deference to Muslim inmates and, additionally, that their refusal to provide individualized meals was related to legitimate penological interests relating to budgetary limitations and the prevention of inmate jealousy and disruption. *Murrell*, Case No. 04 cv 2277, Memo. Sum. Judg., d/e 11. On March 29, 2006, this court granted summary judgment in favor of the Defendants, finding as follows: Here, the Defendants have fulfilled it's constitutional duty to respect the dietary beliefs of this Plaintiff, who is a Muslim, by offering an alternative, pork-free diet. Therefore, the court need not discuss this issue any further. The Defendants are entitled to summary judgment as a matter of law on the Plaintiff's claim that they refused his requests for Halal meats or a vegetarian or fish meal. (*Murrell*, Case No. 04 cv 2277, Order granting Sum. Judg., d/e 32, p. 5, March 29, 2006; Defs.' Stmt. of Facts ¶ 23).

The court finds that in the proceedings in ILCD 04-cv-2277, the plaintiff raised the above identical allegations against the defendants In that case, 04-cv-2277, summary judgment was granted to the defendants and against the plaintiff on March 29, 2006 by this court. Thus, the

11

court takes judicial notice of its own record in 04-cv-2277. That judgment renders the plaintiff's claim that he was denied a vegetarian or Halal meal in violation of his freedom of religion rights under the First Amendment in this case as barred by the doctrine of *res judicata*. *Federated Department Stores, Inc., v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed. 2d 103 (1981); *Phillips v. Shannon*, 445 F.2d 460 (C.A. 7th 1971).

"Under the res judicata doctrine, a final judgment on the merits bars further claims by parties or their privities based on the same cause of action." *World Church of Creator v. Te-Ta-Ma Truth Foundation-Family of URI, Inc*., 239 F. Supp. 2d 846, 847 (C.D. Ill. 2003), (citing Brown v. Felsen, 442 U.S. 127, 131 (1979)). Also, this doctrine provides that prior litigation acts
as a bar not only to those issues which were raised and decided in the earlier litigation but also to those issues which could have been raised in that litigation. *World Church of Creator*, 239 F. Supp. 2d at 847. Three elements constitute the res judicata doctrine: "There must be 1) an identity of the parties or their privities, 2) an identity of the causes of action, and 3) a final judgment on the merits." *World Church of Creator*, 239 F. Supp. 2d at 847.

In the instant case, elements one and three are clearly established. The same parties were involved in the prior suit, and this court entered a final judgment on the merits. As for element two, courts utilize the "same transaction" test for determining the scope of a cause of action. Under this test, a "cause of action" consists of a "single core of operative facts" which give rise to a remedy. *World Church of Creator*, 239 F. Supp. 2d at 848. In the present case, the same core of operative facts exist. Both times Plaintiff was detained at the Kankakee County jail, where he was provided a pork free diet in response to the religious requirements of Muslim inmates. Plaintiff makes the same argument now that he made then: that he is constitutionally entitled to a vegetarian or Halal diet. This court rejected that argument as a matter of law.

Plaintiff alleges that he is being treated unequally because Jewish inmates receive Kosher meals. Assuming, for the sake of argument, that this fact is true,[1] this fact does not change the conclusion that his claim is also barred by res judicata. A mere change in one's legal theory does not create a new cause of action. *World Church of Creator*, 239 F. Supp. 2d at 848. Under these
circumstances, the analysis is the same: whether Defendants singled out a particular religion for special treatment without a secular reason for doing so. *See Kaufman v. McCaughtry*, 419 F.3d 678, 683-84 (7th Cir. 2005). Here, according to Plaintiff's allegations, Defendants provided dietary accommodations to both Muslim and Jewish inmates without singling out one for special treatment. Accordingly, Plaintiff is precluded from re-litigating his First and Fourteenth Amendment claims.

Alternatively, the doctrine of collateral estoppel, or issue preclusion bars Plaintiff's

---

[1] It is undisputed that certified Kosher meals, that is meals with meats butchered and prepared pursuant to Rabbinic law, were not provided to Jewish inmates.

religious dietary claim. Plaintiff's religious dietary claim is also barred by the doctrine of collateral estoppel, sometimes called issue preclusion. The application of collateral estoppel is a question of law. *Adair v. Sherman.*, 230 F.3d 890, 893 (7th Cir. 2000). Collateral estoppel has four elements: "(1) the issue sought to be precluded is the same as that involved in a prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was represented in the prior action." Adair, 230 F.3d at 893. In the instant case, all four elements are easily met. The issue of whether the First Amendment compelled the serving of vegetarian or Halal meals was argued by Plaintiff and actually litigated in his 2004 action; and, this court's determination that Defendants owed no constitutional duty to provide the requested diet was essential to its summary judgment
order in *Murrell*, Case No. 04 cv 2277, Order granting Sum. Judg., d/e 32, p. 5, March 29, 2006. The final element is also satisfied, because the same Defendants were sued in both suits. Accordingly, the doctrine of collateral estoppel bars Plaintiff's religious dietary claim.

Further, Defendant Bukowski was not personally involved in any of the alleged unconstitutional acts or omissions and, therefore, cannot be held liable under 42 U.S.C. § 1983. In order to establish individual liability, Plaintiff must show a causal relationship between his alleged injuries and a defendant's alleged misconduct. *Wolf-Lillie v. Songquist*, 699 F.2d 864, 869 (7th Cir. 1983). As such, Plaintiff must establish that each defendant "caused or participated in the alleged constitutional deprivation." *Id.; also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Plaintiff cannot meet this burden with regard to Sheriff Bukowski. It is
undisputed that Sheriff Bukowski was not personally involved in any of the unconstitutional acts of omissions alleged by Plaintiff in his complaint (Defs.' Stmt. of Facts ¶ 6). Plaintiff argues that, because he addressed grievances to Sheriff Bukowski and because Sheriff Bukowski is the head of the Kankakee Sheriff's Department, he should be held liable for actions in which he was not personally involved. The fact that Plaintiff addressed grievances to Defendant Bukwoski does not demonstrate that Bukwoski was personally involved in answering those grievances or in the decisions to deny Plaintiff's requests. Likewise, being the head of the Sheriff's Department does not demonstrate that Bukwoski was personally involved with the day-to-day running of JCDC or the alleged constitutional violations. *See, e.g., Gentry v. Duckworth*, 65 F. 3d 555, 561 (7th Cir. 1995) (personal involvement is necessary to impose §1983 liability). Accordingly, Sheriff Bukowski is entitled to summary judgment.

Plaintiff's failure to exhaust administrative remedies defeats his Ramadan and Eid-ul-Fitr feasts claims. The Prisoner Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under Section 1983 ... by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C § 1997e(a) (West 2006). To this extent, the PLRA seeks to afford correctional officials time and opportunity to address complaints internally before allowing the initiation of a lawsuit. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Thus, two main objectives are satisfied: (1) the jail is allowed to correct its own mistakes before being

haled into court and (2) the claim may be resolved much more quickly and economically. *See id.* at 89.

To exhaust administrative remedies, an inmate must file complaints and appeals in the place and at the time the prison's administrative rules require. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Such exhaustion is mandatory, even when the relief sought cannot be granted by the administrative process. *See Woodford*, 548 U.S. at 85. The inmate is required to give the prison administration an opportunity to fix the problem or to reduce the dangers complained about even if he is not fully satisfied by the prison's solution. *See Pozo*, 286 F.3d at 1024.

On September 20, 2007, Plaintiff submitted a grievance stating that he was participating in the Ramadan fast and, due to the JCDC's mealtimes, was not receiving adequate nutrition (Defs.' Stmt. of Facts ¶ 40-41). In response, Defendant Downey, as Chief of Corrections, asked his staff to identify all Muslims who were participating in Ramadan. Downey then set a new policy requiring breakfast to be served to Muslim inmates before sunrise, requiring dinner to be served after sunset, and requiring lunch meals to be set aside for Muslim inmates and served with their dinner (reheated if necessary). On September 27, 2007, Downey notified his corrections staff in writing of the new policy. The policy remained in effect for the remainder of Ramadan 2007, and was followed during Ramadan 2008. Downey's prompt action once he learned of Plaintiff's grievance belies any claim that Defendants intentionally violated Plaintiff's rights or was unresponsive to Plaintiff's religious needs. If Plaintiff was unsatisfied with Downey's response to his grievance or had further complaints about the mealtimes during Ramadan, he should have alerted Downey or other jail officials of the continuing problem as required under the PLRA. *See Pozo*, 286 F.3d at 1024-25. However, while Plaintiff submitted numerous grievances during his stay at JCDC, there is no grievance concerning Ramadan mealtimes after September 20, 2007, in the possession of Defendants and no such grievances were produced to Defendants by Plaintiff during discovery. Because Inmate Grievance Forms are created in carbon-copy duplicate, Plaintiff presumably kept in his possession copies of grievances he submitted. However, the Plaintiff has not placed any grievances in the record where he complained after September 20, 2007 that he was not satisfied with Downey's response to his grievance. Therefore, due to Downey's prompt response to the plaintiff's September 20, 2007, no trier of facts could find that Downey intentionally violated the Plaintiff's rights. Further, as he did not file a grievance after September 20, 2007, any claims regarding any alleged violation after September 20, 2007 as to JCDC's mealtimes and adequate nutrition are barred.

Plaintiff submits two exhibits in support of his Ramadan and Eid-ul-Fitr feast claims: a grievance submitted to a correctional officer on September 16, 2008 (Pl.'s Ex. 4 [doc. 64]), and a grievance submitted to a correctional officer on October 6, 2008 (Pl.'s Ex. 5 [doc. 64]). At the onset, neither grievance relates to his claim that he was denied the ability to fast during Ramadan in 2007. Further, Plaintiff presents no evidence that he was denied the opportunity to participate in the Ramadan fast in 2008. At most, in his September 16, 2008, grievance, Plaintiff complained that, as a result of the jail's Ramadan policy, he was not allowed out his cell until

after 9:00 p.m., which meant that the microwave was not available to him to reheat his dinner. The language of this grievance therefore contradicts Plaintiff's claim that Ramadan was not observed in 2008. The grievance relates only to how the jail's Ramadan fasting policy affected his daily schedule. Plaintiff does not indicate whether the lockdown schedule or microwave use problem about which he grieved was ever resolved; however, these problems are not part of his allegations and neither translate to a constitutional violation. Plaintiff never submitted any grievances about the lack of a Eid-ul-Fitr feast at the end of Ramadan as required by the PLRA. Therefore, Defendants are granted summary judgment on Plaintiff's claims that he was denied the ability to participate in the Ramadan feast and Eid-ul-Fitr celebratory feasts.

Defendants are entitled to summary judgment on Plaintiff's claims that he was denied communal worship and religious counseling. Plaintiff also alleges in his Amended Complaint that he was denied religious services and counseling on 12-14-06[,] 11-22-06" (Am. Compl., d/e 18, ¶ 1). Plaintiff has presented no evidence that he was denied religious services and counseling by Defendants. To the contrary, the undisputed facts demonstrate that the jail staff attempted to accommodate Plaintiff's requests, but were unable to do so without Plaintiff's participation. *See Berry v. Peterman*, No. 08 cv 398, 2010 WL 724391, at *7-8 (E.D. Wis. Feb. 26, 2010) (inmate's failure to give necessary information to jail staff defeated his claim that he was denied religious services). Plaintiff has also not presented evidence that the JCDC's requirement that Plaintiff have an appropriate clergy member contact jail administration to arrange for communal worship was not reasonably related to penological interests or even that it created a substantial burden on his religious practice. For jail officials to arrange for communal religious services without Plaintiff's involvement would lead to excessive entanglement problems as the staff attempted to determine which Muslim denomination or clergy member would be appropriate. Similarly, Plaintiff's Downey informed Plaintiff that, if Plaintiff wanted a Muslim clergy member to provide services, that clergy member should contact jail administration to make appropriate arrangements. Plaintiff never provided Defendants with the name of any organization or specific clergy member he wished to see or wished to lead communal services. Plaintiff's suggestion that inmate-led services would have been an appropriate substitute for clergy-lead services has been rejected by other courts. As other courts have noted, allowing an inmate to have authority over other inmates as a religious leader poses security risks for the institution. *See Givens v. Walker*, No. 07-2229, 2009 WL 3575379, at *7 (C.D.Ill. Oct. 23, 2009) (citing Hadi v. Horn, 830 F.2d 779, 784 (7th Cir.1987)).

When Plaintiff requested to see a counselor, Downey asked for further information. Plaintiff's responded that he did not want religious counseling, but instead wanted a social counselor. Downey denied Plaintiff's request because Plaintiff lacked a physician's prescription Further, Plaintiff has not produced any evidence that he suffered from an objectively serious mental health or substance abuse condition; nor was Downey aware of any such condition Therefore, Defendants attempted to accommodate his requests, but could not do so without his cooperation. As with the jail in Berry, Defendants are entitled to summary judgment on this claim.

Further, Plaintiff has not been prohibited from practicing other requirements of

15

his faith, including reading his Qu'ran, praying five times daily using a "prayer towel" provided by the jail, showering (to stay clean so as not to pray with any impurities), and fasting during the holy month of Ramadan. Under these circumstances, Plaintiff has failed to prove that the defendants placed a substantial burden on his ability to practice his religious beliefs. Further, Plaintiff's First Amendment rights were not violated by the inadvertent deprivation of his prayer towel on one occasion. In his Amended Complaint, Plaintiff alleges that on November 16, 2006, Correctional Officer Richmond took his prayer towel with the approval of Defendant Schloendorf (Am. Compl., ¶ 10). When he submitted a grievance about the matter on November 16, 2006, Plaintiff wrote that Richmond took Plaintiff's extra towel when collecting Plaintiff's "whites" (laundry) at 3:35 p.m. At 7:00 p.m., the towel was returned after Plaintiff demonstrated to Richmond that he was allowed to keep two towels in his cell, a fact of which Richmond was unaware. The less than four hour deprivation of Plaintiff's prayer towel was de minimis and does not state a claim under the First Amendment. *See Ingraham v. Wright*, 430 U.S. 651, 674 (1977); *see, e.g., Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (noting that the unavailability of a non-pork meal for the plaintiff at 3 out of 810 meals did not give rise to a constitutional violation); *Turner-Bey v. Indiana Dept. Of Correction*, No. 09 cv 281, 2009 WL 3418204, at *2-3 (N.D. Ind. Oct. 19, 2009) (single failure to provide a non-pork meal does not state a constitutional claim). Richmond's single, unintentional four-hour deprivation of Plaintiff's prayer towel similarly does not rise to the level of a constitutional violation. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim that he was deprived the use of his prayer towel for four hours.

Defendant Ahrens is entitled to summary judgment on the plaintiff's failure to protect claim. In his Amended Complaint, Plaintiff alleges that Cpl. Ahrens failed to report a confrontation between inmate Donnell Eggleston and himself on January 25, 2009, and thus caused Plaintiff to be "punched twice" by Eggleston on January 27, 2009 (d/e 18, ¶¶ 6, 11). Plaintiff's failure to protect allegations are governed by the Fourteenth Amendment's Due Process Clause but analyzed under Eighth Amendment tests. *Woods v. Morris*, No. 04-1440, 2007 WL 2792154, at *17 (C. D. Ill. Sept. 18, 2007) (*citing Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *Henderson v. Sheahan*, 196 F.3d 839, 844 n. 2 (7th Cir. 1999). To state a claim for failure to protect, a plaintiff "must show that there was a substantial risk beforehand that serious harm might actually occur." *See Estate of Rice v. Correctional Medical Services*, No. 06 cv 697, 2009 WL 1748059, at *13 (N.D. Ind. June 17, 2009). A plaintiff must meet two requirements: (1) the deprivation alleged must be, objectively, "sufficiently serious," and (2) the prison official must have a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994). Plaintiff's safety was never seriously compromised. Not every injury suffered by one prisoner at the hands of another translates into constitutional liability for the prison officials responsible for the victim's safety. *Farmer*, 511 U.S. at 834. Rather, only serious harms are protected. *Id*. Plaintiff was never seriously harmed by inmate Eggleston. The only injury he
sustained from the fight was a "busted lip" for which he never sought medical attention.Thus, Plaintiff's safety was ever seriously compromised. *See Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006) (holding that split lip and a swollen cheek do not rise to the level of an objectively serious medical need). Further, Plaintiff admitted during his deposition that the fight

16

on January 27, 2009, was mutual, belying any claim that his safety was seriously at risk. Plaintiff and Eggleston "simultaneously" began fighting and engaged in "mutual combat" Since Plaintiff cannot show that he was ever seriously threatened, Ahrens is entitled to summary judgment.

The Plaintiff has not established a prima facie claim under the Equal Protection clause. Plaintiff claims a violation of his equal protection rights because of purported disparate treatment between female and male detainees. To state a prima facie claim under the Equal Protection Clause, plaintiffs must show: (1) they are similarly situated to members of the unprotected class; (2) they are treated differently from members of the unprotected class; and (3) the defendants act with discriminatory intent. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). The Fourteenth Amendment requires that gender-based distinctions "must serve important governmental objectives and must be substantially related to achievement of those objectives." *See Madyun v. Franzen*, 704 F.2d 954, 962 (7th Cir. 1983) (*quoting Craig v. Boren*, 429 U.S. 190, 197 (1976)). Importantly, "[i]n the prison context, the Equal Protection Clause of the Fourteenth Amendment requires the inmates be treated equally unless unequal treatment bears a rational relation to a legitimate penal interest." *May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000).

First, Plaintiff does not show any difference in treatment that is more than de minimis. Plaintiff alleged in a grievance, his complaint and again in his deposition that the female inmates in segregation have access to more television channels, commissary, and a microwave and are not placed in an isolated ward. These claims are frivolous and do not rise to the level of a constitutional violation. *See Ingraham*, 430 U.S. at 674 (there is a "de minimis level of imposition with which the Constitution is not concerned"); *see also Raney v. Bledsoe*, No. 08 cv 493, 2009 WL 691221, at * 2 (S.D. Ill. Mar. 13, 2009) (inmates do not have a right to a television). Second, Plaintiff is unable to show that Defendants acted with discriminatory intent. To the extent that female inmates are treated differently than male inmates, Defendants have legitimate, compelling safety and pecuniary interests in doing so, which defeats Plaintiff's equal protection claim. *See May*, 226 F.3d at 882. From 2007 to 2009, the two jails in Kankakee County (JCDC and Kankakee County Detention Center) housed, on average, 600 inmates daily. Of those 600 inmates, only 45, on average, were female. The JCDC has housing for 454 inmates in eight housing units and a handful of beds in booking. Currently, all eight housing units are in use. Generally, the JCDC has 16-32 male inmates on administrative or disciplinary segregation status, as compared to four to five female inmates on segregation status. To protect the safety of the detainees, female and male inmates are separated at all times. They have separate housing, separate recreation areas, and separate visitation times. Usually, females are housed in two housing units, Flex A and B. If additional female housing is needed, an entire unit must be converted from male to female housing. Given the limited number of housing units, females in administrative or disciplinary segregation are housed within the female housing units rather than a separate unit. This set-up at JCDC serves two important governmental interests: safety for the inmates and prevention of overcrowded living conditions. Keeping the females and males separated helps keeps the inmates safe from harm from each other and protects the inmates' privacy rights. Therefore, since the female inmates who need segregated housing cannot be

housed with the male inmates, the only possible placements for segregated females are either the female housing units or an entirely separate unit. Given the low numbers of female inmates who need segregated housing (generally four to five a week), it does not make sense for the JCDC to reserve a separate unit for these inmates. It would require keeping the remainder of the cells in that unit empty, which would create overcrowded conditions in the other housing units. Thus, the JCDC keeps female segregated inmates separate from the general population and from male inmates by placing them in 23-hour a day lockdown within the female housing units. This arrangement is the best way to ensure inmate safety and prevent overcrowded and thus, justifies any inadvertent difference in treatment. Therefore, Defendants are entitled to summary judgment on Plaintiff's equal protection claims.

Defendant Stevenson did not violate the Plaintiff's constitutional rights by placing him in administrative segregation.. Plaintiff's due process claim is based on his allegations that he was placed in segregation without a hearing January 13, 2008, to March 19, 2008, and January 27, 2009, to March 5, 2009[2] by Defendant Stevenson. On the onset, however, these claims are barred by the PLRA, because Plaintiff failed to grieve his placement in segregation from January 13, 2008, to March 19, 2008, and January 27, 2009, to March 5, 2009 (Defs.' Stmt. of Facts ¶ 136, 140). *See Pozo*, 286 F.3d at 1025; 42 U.S.C. § 1997e(a).

Plaintiff was placed in segregation for preventative reasons. Detention facilities may, consistent with the Fourteenth Amendment, impose conditions of confinement on pre-trial detainees absent an hearing, so long as such conditions are not imposed with an intent to punish and are pursuant to a legitimate administrative purpose. *Zarnes v. Rhodes*, 64 F.3d 285, 289-291 (7th Cir. 1995). Correctional officials are entitled to impose restrictions on pre-trial detainees pursuant to an appropriate justification, such as maintaining jail security. *Id.* Therefore, if an inmate is placed in segregation to protect himself from other inmates, or to protect jail staff from his violent propensities, no hearing would be required. *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002). *See also Hewitt v. Helms,* 459 U.S. 460, 467-68, 103 S.Ct. 864, 869-70, 74 L.Ed.2d 675 (1983) where the Supreme Court held that placement of a convicted prisoner in administrative segregation does not require the government to first provide due process protections. Likewise, administrative segregation of a pre-trial detainee for a non-punitive reason does not require such procedures. In deciding whether a particular measure is reasonably related to the function of pretrial confinement, the Seventh Circuit has advised that the implementation of such measures is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts ordinarily defer to their expert judgment in such matters." *Rapier*, 172 F.3d at 1003. Further, absent any proof of any jail officials' express intent to punish the inmate by his placement in segregation, jail officials are

---

[2]In his complaint, Plaintiff states that he was placed in segregation between January 13, 2008, to March 20, 2007, and from January 26, 2009, to the date of the complaint, March 4, 2009. Jail records indicate that Plaintiff was in segregation from January 14, 2008, to March 19, 2008, and January 27, 2009, to March 5, 2009

18

entitled to summary judgment. *See Love v. Kirk*, No. 09-1943, 2010 WL 106587, at *2-3 (7th Cir. Jan. 13, 2010) (affirming summary judgment because the inmate failed to show that placement in segregation was punitive).

In the instant case, the Plaintiff was housed in a number of different units throughout the JCDC. Since 2006, Plaintiff was placed in administrative segregation several times because of his inability to get along with other inmates and correctional staff. This decision is intrinsically related to the effective management of the JCDC, and in this regard is entitled to considerable deference. *See Turner v. Safley*, 482 U.S. 78 (1987) (officials are entitled to considerable deference in implementing measures related to the management of the jail). While Plaintiff claims that he was placed in disciplinary segregation on January 13, 2008, and January 27, 2009, there is no evidence to support that claim, and his own speculation does not sustain his burden of evidence on summary judgment. *See Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). Finally, there is no evidence to suggest that Plaintiff was placed in administrative segregation as punishment as opposed to the efficient administration of the jail. Accordingly, Defendants are entitled to summary judgment.

Furthermore, the Due Process Clause does not necessarily protect prisoners against the imposition of disciplinary segregation; rather there must be an "atypical and significant hardship [imposed] on the inmate in relation to the ordinary incidents of prison life." *Williams v. Ramos*, 71 F.3d 1246, 1249 (citing Sandin v. Conner, 515 U.S. 472 (1995)). Specifically, plaintiff must demonstrate that he was denied "the minimal civilized measure of life's necessities." *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (*quoting Robinson v. California*, 370 U.S. 660 (1962)). The Supreme Court has instructed courts to examine: "(1) the duration of confinement in segregation, and (2) how significantly the conditions in segregation differ from conditions in administrative, or discretionary segregation." *Sandin*, 515 U.S. at 472; *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009). If the duration is short, conditions must be significantly harsher than other placements within the jail; conversely, if the conditions are similar to those of other placements, the duration of disciplinary segregation may be relatively long before it implicates a constitutional right. *See Marion*, 559 F.3d at 697 (six months generally does not implicate a liberty interest unless the conditions of confinement were extremely harsh); *Crowder v. True*, 74 F.3d 812, 815 (7th Cir. 1996) (holding that placement of inmate in segregation for three months did not create liberty interest). Plaintiff was in segregation for sixty-five (65) days in 2008 and thirty-seven (37) days in 2009, less than both the inmates in Marion, 559 F.3d at 697 (6 months), and Crowder, 74 F.3d at 815 (3 months). He was accorded a private bed, toilet and sink; he was allowed one hour each day out of his cell to watch television, use a telephone, or exercise; and, he received all his basic necessities, including three meals and a shower each day. Therefore, there is no evidence that the segregated placement created an atypical and significant hardship sufficient to create a liberty interest. Accordingly, Defendants are entitled to summary judgment on Plaintiff's due process claims.

Plaintiff testified that his placement in disciplinary segregation in December 2006 (following his fight with correctional officers on November 14, 2006) violated his constitutional rights because the hearing was held 18 days after the incident, rather than the ten days required

by the JCDC's own rules and regulations. However, violations of statutes, regulations, and internal rules do not give rise to a §1983 claim. *See, e.g., Pozo v Hein*, 179 Fed. Appx. 962, 964, 2006 WL 1217881, at *1 (7th Cir. May 8, 2006); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). Thus, to the extent that Plaintiff claims a constitutional violation based on the lateness of his disciplinary hearing, Defendants is entitled to summary judgment.

Finally, Plaintiff's request for injunctive relief must be dismissed as moot. On April 27, 2010, Plaintiff was transferred from the JCDC to the custody of the Illinois Department of Corrections. "[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief ... become[s] moot." *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004); *see also Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). Because Plaintiff has been transferred to the Illinois Department of Corrections and is no longer subject to the policies, procedures, and conditions of the JCDC, his request for injunctive relief is moot. *Stewart v. McGinnis*, 5 F.3d 1031, 1038 (7th Cir. 1993).

It is therefore ordered:

1. Pursuant to Fed. R. Civ. Pro. Rule 56(c), Defendants Timothy Bukowski, Michael D. Downey, Todd Schloendorf, Zachery Richmond, Shanika Stevenson and Angela Ahrens's summary judgment motion is granted [54]. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff <u>at the close of this case</u>.
2. If the plaintiff wishes to appeal this order, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).
5. The remaining defendants are Joe English, Young, Dorries, Jeffrey Bright, and Kent Smith.
6. A final pre-trial conference is scheduled for April 1, 2011 at 1:30 p.m. The defendants shall appear by phone and the plaintiff, via video conference. The proposed final pretrial order must be filed seven days prior to the final pre-trial conference. Jury trial is scheduled for May 2, 2011 at 9:00 a.m., before the court sitting in Urbana. The clerk of the court is directed to issue a writ to ensure plaintiff's appearance on April 1, 2011 and May 2, 2011.

Enter this 11th day of March 2011

**s\Harold A. Baker**
_____
Harold A. Baker
United States District Judge